1

2

3

4

5

6        **UNITED STATES DISTRICT COURT**

7          **DISTRICT OF NEVADA**

8

9    RODGER E. HAYWARD,

10              Petitioner,                          3:91-cv-00147-LRH-VPC

11   vs.
                                                     ORDER
12   SALVADOR GODINEZ, *et al.*,

13              Respondents.

14   _____/

15

16   Introduction

17           This habeas corpus action is brought by Rodger E. Hayward, a Nevada prisoner.

18   The case is before this court, on remand from the Ninth Circuit Court of Appeals, for reconsideration

19   of the court's denial of Hayward's amended petition on September 27, 2006.

20           The court will vacate its September 27, 2006 order, as well as the judgment entered

21   on that date.  The court will deny Hayward relief on the four claims in his amended petition, will

22   direct entry of judgment in favor of respondents, and will grant Hayward a certificate of

23   appealability.

24

25

26

<u>Petitioner's Trial, Conviction, and Sentence</u>

Hayward was arrested in Las Vegas on June 5, 1982, and he was charged with lewdness and sexual assault on a six year old girl.  Exhibit A. [1] [2]  The charges stemmed from events that occurred on the morning of May 31, 1982.

A preliminary hearing was held on June 22, 1982.  Exhibit B.   The young victim, Jane Doe, testified, and she was cross examined by defense counsel.  *Id*. at 5-23.  Jane's mother also testified, and was cross examined.  *Id*. at 24-37.  Following the preliminary hearing, Hayward was bound over for trial on two counts of lewdness with a minor and two counts of sexual assault. *See* Exhibits C and D.  Pleas of not guilty on all four counts were entered on Hayward's behalf. Exhibit D.

Hayward's trial was held on August 23 and 24, 1982.  Exhibits F and G.

At trial, the first witness to testify for the prosecution was Richard Dimmitt, one of the police officers who arrested Hayward.  Exhibit F, pp. 46-56.  Officer Dimmitt testified that he spoke to Jane Doe's mother on the night of June 3, 1982, and that two days later he arrested Hayward.  *Id*. at 47-49.

The next to testify was Jane Doe.  Exhibit F, pp. 59-110.  She testified that she was six years old, and that she lived with her mother.  *Id*. at 59-60.  Jane testified that on May 31, 1982, she and her mother lived in the same apartment complex as Hayward.  *Id*. at 69-70.  She testified about how she met Hayward, and she testified that he would occasionally watch her while she was swimming.  *Id*. at 70-71.

Jane testified that, on the day of the incident that led to the charges against Hayward, she got out of bed at about 7:30 a.m.  Exhibit F, pp. 72-73.  She testified that, with her mother's

---

[1]  In this order, in the interest of the privacy of the victim and her family, the court will refer to the victim as "Jane Doe," and to her mother as "Sally Doe."

[2]  Unless otherwise noted, the exhibits referred to in this order, and identified by letter, were filed by respondents and are found in the record at docket #13.  Unless otherwise noted, the exhibits referred to in this order, and identified by number, were filed by petitioner and are found in the record at docket #80 and #81.

permission, she then went to Hayward's apartment. *Id*. at 73; *see also id*. at 83-84. She testified that Hayward took her to a store and bought her an ice cream cone, and then they returned to Hayward's apartment. *Id*. at 74; *see also id*. at 95-96. Jane testified that, when they arrived back at Hayward's apartment, Hayward's roommate, Bob, was sleeping on the couch. *Id*. at 74-75; *see also* Exhibit F, p. 113. She testified that Hayward then took her into his bedroom and closed the door. Exhibit F, p. 75. Six-year-old Jane went on to testify as follows:

> Q.    Could you tell us what happened, what happened after he closed the door?
>
> A.    He made me take off my clothes and he took off his.
>
> Q.    How did he make you take off your clothes, Sweetheart?
>
> A.    He told me to.
>
> Q.    After he made you take off your clothes and he took off his clothes, what happened?
>
> A.    He licked my pee-pee.
>
> Q.    Where is your pee-pee located?
>
> A.    Between your legs.
>
> Q.    What did he lick it with?
>
> A.    His tongue.
>
> Q.    how long did he do that?
>
> A.    I don't know.
>
> Q.    After he licked your pee-pee with his tongue, what did he do then?
>
> A.    Licked my butt.
>
> Q.    What did he lick it with?
>
> A.    His tongue.
>
> *          *          *
>
> Q.    [Jane], how long did Rodger lick your butt?
>
> A.    I don't know.

1    Q.    Did his tongue go inside of your butt?

2    A.    No.

3    Q.    After he did that, after he licked your butt, what happened?

4    A.    He made me lick his penis.

5    Q.    Well, where [is] his penis located?

6    A.    Between his legs.

7    Q.    Do you remember whether his penis was hard or soft when he made you lick it?

8    A.    Hard.

9    Q.    Did he say anything to you?

10   A.    No.

11   Q.    Did he – how did he have you lick his penis?

12   A.    He told me to.

13   Q.    What did he say to you?

14   A.    It would taste good.

15   Q.    How long did you lick his penis?

16   A.    I just put it down.

17   Q.    What do you mean, Sweetheart?

18   A.    I really didn't lick it.

19   Q.    What do you mean you really didn't lick it?

20   A.    I don't know.

21   Q.    What happened after that?

22   A.    We put on our clothes.

23                          *    *    *

24   Q.    Did Rodger ever do anything else with his body to you that morning?

25   A.    He rubbed his penis in between my legs.

26   Q.    Was his penis hard or soft when he did that?

4

1      A.     Hard.

2      Q.     How did he do that?

3      A.     We – I laid down on my side and then he put his penis in between my
legs.

4

5      Q.     How did he rub it against you?

       A.     I don't know.
6
       Q.     [Jane], did you ever scream or yell when he was doing these things to
7  you?

8      A.     No.

9      Q.     Is there any reason why you didn't?

10     A.     No.

11     Q.     Did somebody come to the door while you and Rodger were doing
these things?
12
       A.     No.
13
       Q.     Did your mom come to the door sometime that morning?
14
       A.     Yes.
15
       Q.     Did your mom knock?  Did somebody knock on the door?
16
       A.     Yes.
17
       Q.     Did Rodger say anything?
18
       A.     He said, "Don't tell anybody, because you're going to get in trouble."
19
       Q.     Did he say anything to your mom or to the people inside the doorway?
20
       A.     No.
21
       Q.     Did he open the door?
22
       A.     After he had on his swimming trunks.
23
       Q.     Who was at the door?
24
       A.     My mom.
25
       Q.     Was Bob at the door with your mom too?
26
       A.     Yes.

                                    5

1        Q.      What happened when your mom opened the door?

2        A.      I went home.

3   Exhibit F, pp. 75-79.

4        Jane testified that after she left Hayward's apartment with her mother, she did not tell

5   her mother what had happened, despite her mother's questioning, because she was afraid she would

6   get into trouble.  Exhibit F, p. 79; *see also id*. at 80.

7        Jane testified that she had a babysitter named Bea.  Exhibit F, pp. 79-80.  Bea cared

8   for Jane while Jane's mother was at work.  *Id*. at 80.  Jane testified that, a few days after the incident,

9   she told Bea that she had a secret.  *Id*. at 80; *see also id.* at 98-99.  Later, when Jane's mother came

10  to pick her up at Bea's house, Bea told her mother that she had a secret, and then her mother asked,

11  "What happened?"  *Id*. at 80.  Then, Jane testified, she told her mother.  *Id*.

12       Jane's mother, Sally Doe, was the next to testify at trial.  Exhibit F, pp. 111-44.  Sally

13  testified that she had met Hayward a week and a half or two weeks before May 31, 1982; Jane had

14  met Hayward first, and she introduced Sally to Hayward.  *Id*. at 114.  Sally testified that Hayward

15  had been at their home four or five times, that he had dinner there on two occasions, and that he once

16  babysat Jane.  *Id*. at 114, 129, 131, 133.

17       Sally testified that on May 31, 1982, Jane left her apartment at about 7:30 a.m. to

18  go swimming; she understood that Hayward would be watching Jane while she swam.  Exhibit F, pp.

19  114-15.  She testified that at about 8:15 or 8:30 a.m. she noticed that Jane was not swimming,

20  so she went to Hayward's apartment.  *Id*. at 115.  Sally testified as follows about what happened at

21  Hayward's apartment:

22       Q.      What happened when you arrived at the apartment?

23       A.      I knocked on the door and waited a few minutes and Bob answered the
         door, the roommate, and it was obvious that I had just woke him up, by the way he
24       looked, and there was sheets and pillows on the couch.

25       And I said, "Is [Jane] here?"  And he said, "I don't know.  Just a minute."
         And he went towards the bedroom.  These were one bedroom apartments.  He went
26       towards the bedroom and knocked on the door, and I followed him.

6

1      Q.     Did you hear Rodger knock on the door – or excuse me, Bob knock on the door?

2

3      A.     Yes, I did.

       Q.     Did you hear any noise or response from the bedroom?

4

5      A.     Yes. Bob said, "Rodger, [Jane's] mother's here." And he said, "Just a minute, I'm putting on my swimming suit." And I said, "[Jane], come out."

6      Q.     After you said, "[Jane], come out," what happened?

7      A.     Then she and Rodger came out of the bedroom door and we went home.

8

9      Q.     Do you recall how Rodger was dressed?

       A.     In a shirt that wasn't buttoned up, and a pair of swimming trunks and

10  sandals.

11      Q.     Did you ask [Jane] what happened in the apartment?

12      A.     Yes.

13      Q.     If anything happened?

14      A.     Well, I just had kind of a bad feeling, and I don't know if I can explain those to people. And I asked [Jane], I said, "[Jane], did anything happen?" And she

15  said, "No. no." And I said, "Well, are you sure? You know, you can tell Mommy." And she said, "No, nothing happened. I just wanted to go swimming."

16

17      Q.     Could you describe [Jane's] mannerisms, the way she was responding to you, and the way she was acting as you were asking her these questions?

18      A.     She was a little nervous and playing with her hands a lot, wringing her hands, and she seemed upset, but she wouldn't tell me anything.

19

20      Q.     How many times did you ask her if anything happened in the apartment?

21      A.     Well, I asked her a couple times when we were walking back to our apartment, and later on in the day I asked [her] again, and she was emphatic that

22  nothing happened, nothing happened.

23  *Id*. at 115-16.

24      Sally testified that she took Jane swimming later that morning. Exhibit F, p. 116-17.

25  Hayward was at the pool. *Id*. at 117. Sally testified as follows about Hayward's mannerisms at the

26  pool:

1        Q.     Did you have occasion to have [sic] Rodger Hayward's mannerisms at
the pool?

2

3        A.     He seemed on edge.

     Q.     What do you mean by that?

4        A.     Just he was very talkative and a little strange.

5

6   Exhibit F, p. 117.

7        Sally testified as follows about what she notice when she bathed [Jane] later on the

8   day of the incident:

9        Q.     Did you have occasion to give [Jane] a bath that Monday?

10       A.     Yes, I did.

11       Q.     Did you notice anything unusual on her body?

12       A.     She told me that her pee-pee hurt, which is her vaginal area, and –

13       Q.     Does she use that term –

14       A.     Yes, she does.

15       Q.     – for her vaginal area?

16       A.     Yes.  So I said, "Well, you probably need a bath."  I figured she was
in chlorine for a long period of time, because we swam probably four hours maybe,

17  and she stays in the water the whole time.  And I noticed some redness, but I just
assumed that it was from the chlorine.

18
     Q.     Where was the redness located on her body?

19       A.     In her vaginal area.

20

21  Exhibit F, p. 117-18; *see also id*. at 135.

22       Sally testified that on the night of Thursday, June 3, 1982, at Bea's home, Jane first

23  told her about what had happened in Hayward's bedroom.  Exhibit F, pp. 118-19, 123-24.  Sally

24  described as follows how Jane told her what happened:

25

26

1   Q.   How exactly were you all seated?

2   A.   I was seated in a chair like this, and Bea was sitting facing me and
    [Jane] alternated between standing up and sitting on my lap and sitting on Bea's.
3
    Q.   What was [Jane's] emotional condition when you saw her that
4   evening?

5   A.   Very poor.

6   Q.   Tell the jury what you mean by very poor.

7   A.   She was scared and she was very nervous, and she didn't want her
    babysitter to tell me what had happened.  And she was very embarrassed.
8
    Q.   Did you talk to your daughter or did Bea; what exactly what
9   happened?

10  A.   I asked [Jane] – she didn't want to tell me, so I said, "Well, if I guess,
    will you tell me?"  And she said yes.  And I would ask things and either it would be
11  yes or not, and then she would whisper in my ear.

12  She whispered in my ear that he made her suck his penis.  And then I had to
    whisper in Bea's ear, because it was like girl talk and, you know, it was embarrassing.
13

14  Q.   What else did [Jane] whisper to you that evening?

15  A.   She whispered most of the facts to me, you know, like he licked her
    pee-pee and her butt.
16
    Q.   What else?
17
    A.   That he told her that I would whip her if I found out.
18
    Q.   What was [Jane's] emotional condition while she was whispering
19  those things to you?

20  A.   She was very, very upset, and she'd cry and whine.

21  Q.   What were you doing when she was telling you these things?

22  A.   Trying to be brave.

23  Q.   What do you mean, trying to be brave?

24  A.   I didn't cry in front of her.  I was upset, and she knew it, but I tried to
    reassure her that she hadn't done anything wrong, and she wasn't in any trouble at all.
25

26  Exhibit F, pp. 124-25; *see also id*. at 138.

9

Sally testified that she called the police that night, after Jane told her what had happened.  Exhibit F, p. 119.  Two police officers went to Sally's home, and questioned Sally.  *Id*. at 121.  Jane was unwilling to talk to the police officers.  *Id*.  The next day, Sally took Jane to speak with a female sexual assault detective, Sherry Richardson.  *Id*. at 122.  Sally testified that Jane opened up with Detective Richardson, and told her what happened with Hayward.  *Id*. at 122-23.

Sally testified about how she informed the police of Hayward's whereabouts on June 5, 1982, the day he was arrested.  Exhibit F, pp. 119-21.

Sally then testified that she took Jane to speak with a deputy district attorney, Karen Van de Pol.  Exhibit F, pp. 125-26.  She also testified about taking Jane to Hayward's preliminary hearing, and about the interview conducted by deputy district attorneys before the preliminary hearing.  *Id*. at 127-28.

Sally also testified about Jane's sleep patterns:

> Q.    Has [Jane] ever woken up with nightmares since she's been back from Kansas?
>
> A.    [Jane's] been – since a week ago Saturday, she's slept two nights through, one when she slept with me in bed, and the other one was probably out of sheer exhaustion.  I moved her three different times.  She never woke up.  She also bites her fingernails now.
>
> Q.    You have indicated she's slept two nights; what about the other nights?
>
> A.    [Jane's] been up with nightmares.  She has bad dreams.  Luckily, when I asked her what they were about, most of them she can't remember, they were just bad.

Exhibit F, pp. 128-29.

The next to testify was Jane's babysitter, Bea.  Exhibit G, pp. 2-17.  Bea testified that starting in April 1982, she babysat Jane five days a week, for eight or nine hours a day.  *Id*. at 4.  Bea testified that on Thursday, June 3, 1982, she took Jane and two other young children to a store, and, in the course of that trip, heard Jane repeatedly tell another child that she had a secret.  *Id*. at 5-7; *see also id*. at 13-15.  When Bea was alone with Jane, Jane struggled with whether or not to tell

Bea the secret, and was worried that Bea would tell her mother that she had a secret.  *Id*. at 8-9.

Later, when Sally arrived to pick up Jane, and Sally, Jane, and Bea were together on Bea's patio,

Sally asked Jane if Jane had something to tell her.  *Id*. at 10-11.  Jane said: "Please, mommy, don't

make me say anything."  *Id*. at 11.   Jane was afraid she would get into trouble, and she started to cry.

*Id*.  Bea testified that Sally continued to ask her what the secret was, and then Jane began to whisper

in her mother's ear:

> Q.     Tell us what happened when [Sally] questioned [Jane].
>
> A.     She just said – at the time I was already a nervous wreck, watching [Jane], and she just said, "What is it, [Jane]," and [Jane] said, "Well, I can't tell you. Please don't make me tell you."
>
> And she said, "But, [Jane], you have got to tell me."  And in between [Jane] was crying, and then she just turned around and she says, "Mommy, can I tell you, can we play a game."  And she tried to tell her, in her ear.   And [Sally] just – her eyes just – [she] just looked at me, and I just looked at [her].
>
> Q.     What was [Sally's] expression?
>
> A.     Like a shock.  She just looked straight at me, and I just looked at [her].
>
> Q.     Did [Sally] whisper or say anything to [Jane] as [Jane] was talking to her mother?
>
> A.     Well, [Jane] was talking to her mother, in her ear, and then [Sally] talked back to [her], and they were both talking back an forth.  At that time I was a nervous wreck.  I just got up.
>
> Q.     Were you able to overhear what was being said by [Sally] to [Jane] when they were whispering?
>
> A.     I don't remember.  I just know that [Jane] was crying, and [Sally] was talking to her, and then I went into the house, and I came right back.
>
> Q.     Could you overhear anything that [Jane] said to her mother as she was whispering to her mother?
>
> A.     No, I couldn't, because, see, [Jane] went on her other side of her mother.  And I was sitting – there was a table between us on our lawn chairs.
>
> Q.     Why did you go into your house?
>
> A.     Because looking at [Sally's] expression and listening to [Jane's] whining, I just went in to get a cigarette.

11

1  *Id*. at 11-12.  Bea testified that she had never before heard Jane mention sex, or "anything about

2  penises or anything, any such thing like that."  *Id*. at 12-13.

3        The prosecution then rested.

4        The defense called two witnesses.  The first witness called by the defense was a

5  manager of the apartment complex where Hayward, as well as Sally and Jane, had lived.  Exhibit G,

6  pp. 21-23.  That witness stated that his records did not reflect that Hayward rented the apartment

7  where the May 31, 1982 incident occurred, and he testified that he had never seen Hayward and was

8  not acquainted with him.  *Id*. at 23.

9        The defense then called to the witness stand an investigator.  Exhibit G, pp. 24-26.

10  Through that witness, the defense introduced a photograph of Hayward's roommate, Bob.  *Id*. at

11  24-25.  The investigator testified that he had attempted to locate Bob, but had been unsuccessful.  *Id*.

12  at 26.

13        The court and counsel then settled the jury instructions, the instructions were read to

14  the jury, counsel argued their cases, and the jury deliberated.  Exhibit G, pp. 27-68.

15        The jury returned verdicts finding Hayward guilty of one count of sexual assault and

16  three counts of lewdness with a minor.  Exhibit G, pp. 68-70; Exhibit I.

17        Hayward's sentencing hearing was held on September 24, 1982.  Exhibit L.

18  Hayward was sentenced to life in prison on the sexual assault charge (Count II), and to ten-year

19  concurrent prison terms on each of the lewdness charges (Counts I, III, and IV).  Exhibit K.  The

20  judgment of conviction was entered November 30, 1982.  *Id*.

21        Hayward is currently serving the life sentence.

22  <u>Post-Judgment Procedural History</u>

23        At the sentencing hearing, on September 24, 1982, Hayward stated that he wished to

24  appeal, but that he wished to represent himself on appeal.  Exhibit L, pp. 4-5.  In addition,

25  Hayward's trial counsel informed the judge that Hayward intended to claim that counsel had

26

1   provided inadequate representation at trial, and, therefore, Hayward's counsel asked to withdraw. *Id*.

2   The court discharged Hayward's attorney. *Id*.

3         Hayward then failed to file a timely notice of appeal. Therefore, there was no direct

4   appeal at that time.

5         On January 27, 1988 – more than five years after his conviction[3] – Hayward filed, in

6   Nevada's first judicial district court, a petition for a writ of habeas corpus. Exhibit P. Counsel was

7   appointed for Hayward. *See* Exhibits 1, 5. On May 14, 1990, the state district court conducted an

8   evidentiary hearing. Exhibit 22. On July 6, 1990, the court entered an order denying Hayward's

9   petition. *See id*.; *see also* Exhibit T. On appeal, on January 8, 1991, the Nevada Supreme Court

10  upheld the district court's ruling that there had been no ineffective assistance of counsel, and ruled

11  that Hayward's claims of prosecutorial and judicial misconduct were waived because they could

12  have been, but were not, raised in a direct appeal. Exhibit X. The appeal from the denial of the state

13  habeas petition was, therefore, dismissed. *Id*.; *see also* Exhibits 35, 36.

14        Hayward then initiated this federal habeas corpus action. The court received from

15  Hayward a *pro se* petition for writ of habeas corpus on March 29, 1991 (docket #1). The court

16  determined that the petition included a claim of insufficiency of the evidence that had not been

17  exhausted in state court, and the court gave Hayward the option of either returning to state court

18  to exhaust the claim or proceeding in federal court on only his exhausted claims (docket #18).

19  Hayward abandoned the unexhausted claim, and on January 30, 1992, filed an amended petition

20  (docket #19, #20, #21, #22).

21        The amended habeas petition filed in 1992 (docket #22) contained claims of

22  ineffective assistance of counsel, prosecutorial misconduct, and judicial misconduct. The court

23

24        [3]   In 1987, Hayward escaped from prison for a time. In 1988, Hayward was convicted and
      sentenced to five years in prison for unauthorized absence from place of classification assignment, a
25    charge resulting from the 1987 escape. *See* Judgment of Conviction dated February 10, 1988 (located
      in the record at docket #59); *see also* Exhibit 22, pp. 34-35. That sentence is to be served consecutively
26    to the sentences imposed in 1982. *See* Judgment of Conviction dated February 10, 1988. Hayward's
      1987 escape, and the resulting conviction and sentence, have no bearing upon the rulings in this order.

ultimately ruled that the claims of prosecutorial and judicial misconduct were procedurally defaulted, and that Hayward was not entitled to relief on his claims of ineffective assistance of counsel (docket #26, #30, #33, #36).  Hayward's amended petition was denied (docket #36).                Hayward appealed (docket #38).  On June 10, 1994, the court of appeals affirmed in part, reversed in part, and remanded the case.  Memorandum Order (docket #49).  With respect to Hayward's claims of ineffective assistance of counsel before trial and at trial, the appellate court affirmed the denial of habeas corpus relief.  *Id*. at 2-4.  However, the appellate court held that Hayward's trial counsel had been ineffective in not filing a notice of appeal, or explaining to Hayward how to do so, before withdrawing from the case.  *Id*. at 4-8.  Therefore, as to the claim of ineffective assistance of counsel involving the failure to perfect an appeal, the appellate court reversed, and remanded the case, directing this court to "issue the writ and determine a reasonable time in which the State of Nevada shall grant Hayward a delayed appeal with the benefit of appointed counsel unless he chooses to proceed pro se, or release him." *Id*. at 8.  The appellate court declined to consider Hayward's claims of prosecutorial and judicial misconduct, explaining that, because Hayward was entitled to an appeal in state court, he would have an opportunity to raise those claims in state court.  *Id*. at 8, footnote 2.

On July 26, 1994, after hearing from the parties, this court ordered the petition for writ of habeas corpus granted in part, as directed by the court of appeals.  Minutes of the Court (docket #52).  The court ordered that Hayward was to be permitted to proceed with a delayed appeal with the benefit of appointed counsel.  *Id*.

Hayward then returned to state court, and, with the benefit of counsel, pursued an appeal.  Exhibits 41, 42.  On October 4, 1995, however, the Nevada Supreme Court dismissed the appeal, on a motion by the State.  Exhibit 55.  The Nevada Supreme Court ruled that it had no jurisdiction over the delayed appeal, and stated:  "When a defendant has been denied the right to a direct appeal due to the ineffectiveness of counsel, the defendant may raise any direct appeal issues in a petition for a writ of habeas corpus, and the district court must appoint counsel to assist the defendant."  *Id*. at 1.  The appeal was dismissed without prejudice to Hayward's right to pursue a

14

1   petition for a writ of habeas corpus in the state district court.  *Id*. at 2; *see also* Exhibit 56.

2       On November 8, 1995, Hayward filed, in this case, a Motion for Order to Enforce

3   Writ (docket #53).  The respondents responded, and the court held a hearing (docket #55, #56, #57).

4   The court granted the motion in part and denied it in part, and ordered Hayward to file a petition

5   for post conviction relief in the state district court.  Memorandum Decision and Order, entered

6   January 11, 1996 (docket #58), p. 4.  The court further ordered that Hayward was to be released from

7   prison unless he was appointed counsel, or agreed to proceed *pro se*, and granted a delayed appeal of

8   the claims that he could have raised in a direct appeal.  *Id*.

9       Hayward then initiated a state habeas proceeding, and was appointed counsel.  Exhibit

10  59.  He filed the state habeas petition, with the benefit of counsel, on May 21, 1996.  *Id*.

11  The state district court entertained argument on the petition on July 8, 1996.  Exhibit 66.  On

12  July 11, 1996, the court denied the petition.  Exhibit 67.  Hayward appealed.  Exhibit 68.  On

13  September 29, 1999, the Nevada Supreme Court ruled that the district court had properly denied the

14  petition, and it dismissed the appeal.  Exhibit 84.

15      Back in this court, Hayward then asserted that the State had not provided him with the

16  sort of delayed appeal required by the orders of the court of appeals and this court.  He moved to

17  reactivate this case and enforce the judgment of the court by issuing an unconditional writ of habeas

18  corpus (docket #63).  The court appointed counsel for Hayward (docket #69A), and the matter was

19  briefed.  On April 30, 2003, the court denied Hayward's motion for issuance of an unconditional

20  writ, ruling that Hayward had received the functional equivalent of a direct appeal, by virtue of his

21  appeal of the denial of his state habeas petition.  Order entered April 30, 2003 (docket #106).

22  Judgment was entered in favor of respondents (docket #107).

23      Hayward filed a motion for reconsideration (docket #108).  On November 24, 2003,

24  the court granted that motion in part and denied it in part (docket #119).  The court ruled that the

25  denial of the unconditional writ of habeas corpus had been proper, but that judgment should not have

26  been entered, as Hayward still had claims to be litigated in this federal habeas action.  The court

1  vacated the judgment, and set a schedule for Hayward to file an amended habeas petition.

2          On February 10, 2004, Hayward filed a "First Amended Petition for Writ of Habeas

3  Corpus" (docket #124).[4]

4          On May 26, 2004, respondents filed a motion to dismiss (docket #128), arguing that

5  the 2004 amended petition included claims not exhausted in state court.  However, after Hayward

6  responded to that motion (docket #131), it was withdrawn by respondents (docket #132), and the

7  court denied the motion to dismiss on June 29, 2004 (docket #133).

8          Respondents subsequently filed an answer (docket #134), and Hayward filed a

9  traverse (docket #139).

10          On September 27, 2006, the court entered an order (docket #141) denying the

11  petition, and judgment was entered in favor of respondents (docket #142).

12          Hayward filed a Notice of Appeal (docket #143), and a Application for Certificate

13  of Appealability (docket #144).  In the Application for Certificate of Appealability, Hayward

14  argued that the court applied the wrong standard in its analysis of the merits of his claims in the

15  September 27, 2006 order.  Respondents filed a response to the Application for Certificate of

16  Appealability (docket #145).  In their response, respondents conceded that the wrong standard of

17  review was applied.  Response to Application for Certificate of Appealability (docket #145), p. 1-2

18  (citing *Woodford v. Garcieu*, 538 U.S. 202, 204 (2003), and *Lindh v. Murphy*, 521 U.S. 320, 326

19  (1997)).

20          On February 27, 2008, the court entered an order (docket #147) granting Hayward a

21  certificate of appealability (COA) with respect to five issues.  In that order, in addition to granting

22  Hayward a COA, the court acknowledged that the wrong standard had been applied.  Because the

23  notice of appeal had divested the court of jurisdiction with regard to the merits of the case, the court

24  followed the procedure described in *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004),

25

26          [4] This was actually Hayward's second amended petition, as he had previously filed an amended petition on January 30, 1992 (docket #22).  In this order, the court refers to the amended petition filed on February 10, 2004, as Hayward's "2004 amended petition."

1   stating in the order that it "would be inclined to reconsider its September 27, 2006 order, and the

2   judgment of the same date, under Federal Rule of Civil Procedure 60(b), if the Court of Appeals

3   were to remand the case for that purpose."  Order entered September 27, 2006 (docket #147), p. 4.

4          On September 10, 2008, the court of appeals ordered the case remanded

5   (docket #157).  The order stated that the remand is "to allow the district court an opportunity to

6   reconsider its September 27, 2006 order and judgment under Federal Rule of Civil Procedure 60(b)."

7   Order of September 10, 2008 (docket #157), p. 1.

8          Following the remand, on January 8, 2009, the court held a status conference, and

9   conferred with the parties regarding their briefing of the reconsideration of the merits of the claims in

10  the 2004 amended petition (docket #161).  Petitioner's counsel indicated that his opening argument

11  regarding the reconsideration is found at pages 38 to 61 of Exhibit A to a Motion for Expedited

12  Status Conference (docket #154) (hereafter, "Opening Brief") filed on Hayward's behalf on October

13  17, 2008.  The court set a schedule for respondents to respond to that briefing, and for Hayward to

14  reply.   Respondents filed their response on February 5, 2009 (docket #162), and Hayward replied on

15  February 25, 2009 (docket #163).

16  Habeas Corpus Standards

17         Hayward initiated this federal habeas action before the enactment of the Antiterrorism

18  and Effective Death Penalty Act of 1996 ("AEDPA").  Therefore, this court's

19  consideration of the merits of his claims is governed by pre-AEDPA standards.  *See*, *e.g.*, *Lindh v.*

20  *Murphy*, 521 U.S. 320, 326 (1997); *Karis v. Calderon*, 283 F.3d 1117, 1126 n. 1 (9th Cir.2002).

21         Under pre-AEDPA law, written findings of fact made by state courts are presumed

22  correct.  18 U.S.C. § 2254(d) (1994).

23         On the other hand, in pre-AEDPA cases, questions of law, as well as mixed

24  questions of law and fact, are reviewed *de novo*.  *See*, *e.g.*, *Thompson v. Borg*, 74 F.3d 1571, 1573

25  (9th Cir.1996).

26         However, in pre-AEDPA habeas cases, "state court judgments of conviction and

1   sentence carry a presumption of finality and legality and may be set aside only when a state prisoner

2   carries his burden of proving that [his] detention violates the fundamental liberties of the person,

3   safeguarded against state action by the Federal Constitution ."  *Hayes v. Brown*, 399 F.3d 972, 978

4   (9th Cir. 2005) (en banc) (quoting *McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir.1994).

5   Analysis

6          Ground 1

7          In Ground 1, Hayward claims that his right to due process of law, under the Fifth

8   and Fourteenth Amendments, was violated by prosecutorial misconduct during closing arguments.

9   2004 Amended Petition (docket #124), pp. 14-16.  Specifically, Hayward first claims that the

10  prosecutor committed misconduct by commenting on certain testimony of Jane's mother, Sally,

11  regarding Jane's interview by Detective Sherry Richardson.  *Id*. at 14-15.  Second, Hayward claims

12  that the prosecutor shifted the burden of proof by pointing out that Hayward did not call certain

13  witnesses.  *Id*. at 16.

14         With regard to Hayward's first contention, the portion of Sally's testimony mentioned

15  in argument by the prosecutor was the following:

16         Q.     What happened during that interview?

17         A.     First of all, Sherry gained my daughter's confidence.  She told her all
       about her children and her pets and different things. [Jane] didn't want to talk to
18     Sherry and Sherry brought out a little anatomical dolls, and – they're rag dolls.  One
       was a man and one was a woman.  One was a boy and one was a girl.

19
       And she wanted [Jane] to show her with using the dolls what happened.  And
20     [Jane] said, "Well, we can't use this one, because he didn't have any hair around his
       penis."  So we used the boy doll.

21     Q.     Which doll did [Jane] use for her?

22
       A.     The little girl, because the female doll had breasts and --
23
       MR. HENRY [Hayward's counsel]: I think this is getting far afield.  This is
24     hearsay and I'm not sure --

25     THE COURT:   Prior inconsistent statements to rehabilitate the witness,
       counsel.  Overruled.
26

Exhibit F, p. 122.  As is plain from the transcript, the court overruled the objection made by defense

1   counsel, and the testimony was allowed.

2        The prosecutor addressed this testimony in his closing argument as follows:

3        One other fact, obviously, this one isn't rehearsed.  I submit to you that it wasn't.  [Jane] and her mother went down to the Sexual Assault office of the Metropolitan Police Friday after it was reported to [Jane's] mother, [Sally].  And if you recall [Sally's] testimony, Sherry Richardson, the Sexual Assault detective, brought out four dolls.  They're called anatomically correct dolls.  One is a full grown man and woman, and one is a little boy and a little girl.  The full grown man and woman have pubic hair.  The little boy and the little girl don't.

        Why did [Jane] pick out the little boy for the defendant, rather than the man, if her story was so contrived.  She picked him out because she saw his genitals.  He has no pubic hair.  For whatever reason, he shaves or doesn't have.

        MR. HENRY [Hayward's counsel]:  Your honor, counsel's arguing facts not in evidence.

        THE COURT:  Very well.  Proceed.

        MR. HENRY:  There is no evidence at all of whether or not the defendant has pubic hair or doesn't.

        THE COURT:  So noted.  Proceed.  Argue the evidence counsel.

        MR. DICKINSON [the prosecutor]:  Ladies and gentlemen, I would submit that certainly an inference from that, from [Jane's] picking out the small boy, rather than the man, is that he did not, and she testified they were both undressed in that apartment, bedroom.

Exhibit G, pp. 37-38.  Defense counsel then responded, as follows, in his own closing argument:

        And then, rather inappropriately, as the Judge pointed out, we heard some talk about which anatomically correct dolls have pubic hair and which don't, and that the little boy doll was chosen because he does not have pubic hair, as opposed to the man doll.  And then the assertion by the prosecutor, even though he proffered no evidence, that the defendant did not at the time have any.

        Well, when as a prosecutor you raise this sort of thing for the first time in closing argument, it doesn't give anybody much of a chance to present any evidence.  And when you raise it for the first time several months after the man's been arrested, even though he's only arrested a few days after the offense, it doesn't matter, because whatever the defense says, it can be explained that it was changed, that it was grown or cut off during the intervening time.

        But we know the defendant was arrested, and we know that when people are arrested, they're in the custody of the police.  Photographs are taken.  We know that

        the little girl said something to the police even before the man was arrested.  This is kind of a critical-type of identification testimony.

19

1
2
3

       The prosecutor and the police could have bolstered their case, or they could have gathered evidence to acquit an innocent man, which is their obligation too, but they didn't.  Instead they choose to wait until it's too late for anybody to even present any evidence, even if it was possible at this late date, and they bring it up in closing argument.

4

Exhibit G, pp. 58-59.  Then, in his rebuttal argument, the prosecutor argued as follows:

5
6
7

       He [defense counsel] mentions why did we wait or why did I mention in my closing argument the quite obvious inference when [Jane] picked out a little boy doll rather than the man, as opposed to the man doll, and why am I raising that in closing argument for the first time.

8

       Well, ladies and gentlemen, it was raised during testimony.

9
10

       [Sally] indicated, testified that [Jane] picked out that doll as being Rodger, the defendant.  Ladies and gentlemen, I guess I point out to you that [Jane] and [Sally] and Bea, the babysitter aren't on trial here.  He is on trial.  The defendant's on trial.

11

              *   *   *

12
13
14
15
16

       Certainly, going to the Stop 'n Go, buying ice cream cones, both individuals being alone in the bedroom with the door locked, when they were supposed to go swimming.  Ladies and gentlemen, somehow the defense, and I would submit, twisted this case such a way that he is not on trial, that [Jane] and her mother are.  Somehow the innocent victims have become the criminals.  Somehow a little six year old girl that's had to go through hell has become the criminal.  Somehow the DA's office and the police department have become the criminals, suggesting ideas to her, even though [Jane] picked the anatomically correct little boy doll.

17

       THE DEFENDANT:  She did not.  They have never proven that, sir.  I have pubic hair.

18

       THE COURT:   If you make another remark, I will have to do something about that.

19

       Proceed.

20
21

       MR. DICKINSON [the prosecutor]:   Thank you, Your Honor.

22
23

       Even though [Jane] picked out the anatomically – the boy doll, somehow [Jane's] on trial.  Somehow she's supposed to be perfectly consistent with all of her testimony, and somehow [Sally Doe], who is trying to raise her child and is working, was wrong in not taking her daughter to a doctor.  Maybe not soon enough.

24

Exhibit G, pp. 62-63, 66.

25
26

       Prosecutorial misconduct may rise to the level of a constitutional violation when the

prosecutor's comments so infect the trial with unfairness as to make the resulting conviction a denial

1    of due process.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  It is "not enough that the

2    prosecutor's remarks were undesirable or even universally condemned." *Id*.  Under *Darden*, the first

3    question is whether the prosecutor's remarks were improper and, then, if so, whether they infected

4    the trial with unfairness.  *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).

5                   The prosecutor's arguments regarding the testimony about Hayward's lack of pubic

6    hair were not improper.  The court admitted the testimony of Sally to the effect that Jane said that

7    Hayward had no pubic hair.  *See* Exhibit F, p. 122.  The prosecutor argued the import of that

8    testimony, suggesting that Jane's apparent knowledge regarding Hayward's pubic hair showed her to

9    be credible.  The prosecutor's argument was not improper.  It was fair argument about testimony that

10   had been admitted by the court.

11                  Hayward contends that the prosecutor's argument was improper because he argued

12   facts not in evidence.  However, there was evidence that Hayward had no pubic hair: the testimony

13   of Jane and Sally.  Jane testified that she saw Hayward naked, and Sally testified that Jane told the

14   detective that Hayward had no pubic hair.  The prosecutor was entitled to comment on this evidence,

15   and its implications, in his closing argument.  Hayward cites no Nevada or federal authority holding

16   that such evidence had to be corroborated before the prosecutor could comment on it in closing

17   argument.[5]  This court concludes that the prosecutor's arguments concerning the matter of

18   Hayward's pubic hair were not improper.

19                  Furthermore, even if these comments were improper – and, again, this court finds that

20   they were not – the court would not find them to be so prejudicial as to infect Hayward's trial with

21   unfairness.  Jane's testimony was compelling.  Despite Hayward's arguments to the contrary, it does

22   not appear to have been contrived or coached.  And, it was well supported by the testimony of Jane's

23   mother and Jane's babysitter.  Moreover, when the prosecutor made the argument at issue, and

24   

25        [5]  The real impropriety, with respect to this issue, was on the defense side:  the outburst by
26   Hayward, in which he declared, in the presence of the jury, that Jane picked the wrong doll, that the
     prosecution did not prove that he had no pubic hair, and that, in fact, he did have pubic hair.  Exhibit G,
     p. 66.  The prosecution had no opportunity to cross-examine Hayward regarding those statements.

1   defense counsel objected, the trial judge noted the objection and instructed the prosecutor, in the

2   presence of the jury, to "argue the evidence."  Exhibit G, p. 38.   And, the instructions given to the

3   jury included an instruction that "[s]tatements, arguments and opinions of counsel are not evidence

4   in the case."  Exhibit H, Instruction 14.

5          Next, Hayward contends that the prosecutor improperly shifted the burden of proof to

6   him by commenting in closing argument that defense counsel could have, but did not, subpoena

7   certain witnesses.

8          In closing argument, defense counsel argued as follows:

9          Something else that's interesting is we have a situation here where there were
       a bunch of people involved, but the only people called by the prosecutor are people
10      that are all related to each other one way or another.

11         Now, [Sally] and [Jane], that makes sense, has to be, mother and daughter.
       However, we have two patrol officers that are originally called to the scene, Dimmitt
12      and his partner.  But only Dimmitt's called as a witness.  The partner, who might be
       more useful, because he, for example is the one who talked to the detective, that
13      purportedly said, no, don't take her to the doctor, and could tell us shoe that detective
       was, he wasn't ever called.  Of course, he didn't work with [Sally], and he didn't used
14      to stop by her house and see how she was a lot.  So that's three people.

15         Then we have the babysitter.  We heard a lot about the juvenile detective,
       Sherry Richardson.  She wasn't called.  Well, she is not related to anybody.
16

17   Exhibit G, pp. 57-58.

18         In response, in the State's closing argument,  the prosecutor argued as follows:

19         The testimony that took place in this trial, you have only heard part of it from
       Mr. Henry.  He mentions why didn't the State call Officer Kirk or Sherry Richardson.
20      he didn't say also the defense has subpoena power.  The defense could have
       subpoenaed those witnesses also.  That's not mentioned.
21

22   Exhibit G, p. 62.

23         Hayward does not cite any authority to the effect that it is unconstitutional burden

24   shifting for the prosecution to mention the failure of the defense to call witnesses, particularly where

25   the defense, in its own argument, raises the issue of the failure of those witnesses to testify.  Nor

26   does Hayward address the well-established rule that it is generally not improper for a prosecutor to

22

1   comment on the failure of the defense to call witnesses.

2   　　　　　"A prosecutor's comment on a defendant's failure to call a witness does not shift the

3   burden of proof, and is therefore permissible, so long as the prosecutor does not violate the

4   defendant's Fifth Amendment rights by commenting on the defendant's failure to testify."  *United*

5   *States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000); *see also United States v. Vaandering*,

6   50 F.3d 696, 701-02 (9th Cir. 1995); *United States v. Williams*, 990 F.2d 507, 510 (9th Cir. 1993);

7   *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991).  The test to determine whether there has

8   been an unconstitutional comment on the defendant's silence is "whether the language used was

9   manifestly intended or was of such a character that the jury would naturally and necessarily take it to

10  be a comment on the failure to testify."  *United States v. Tam*, 240 F.3d 797, 805 (9th Cir. 2001)

11  (quoting *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir.1995)).

12  　　　　　In this case, defense counsel raised the issue of the uncalled witnesses, and the

13  prosecutor responded in a manner allowed under the federal constitution.  *See Williams*, 990 F.2d at

14  510 ("Because the defense counsel "opened the door" to the issue of the uncalled witness, the

15  prosecutor's reply was permissible.").  The prosecutor's argument included no comment whatsoever

16  on Hayward's decision not to testify.

17  　　　　　The court will deny habeas corpus relief with respect to Ground 1.

18  　　　　　<u>Ground 2</u>

19  　　　　　In Ground 2, Hayward claims that his right to due process of law, under the

20  Fourteenth Amendment, was violated because there was insufficient evidence to support his

21  conviction.  2004 Amended Petition, pp. 17-24.  Hayward claims that there was insufficient evidence

22  with respect to each of the four counts on which he was convicted.  *Id.*

23  　　　　　When a habeas petitioner challenges the sufficiency of evidence to support his

24  conviction, the court reviews the record to determine "whether, after viewing the evidence in the

25  light most favorable to the prosecution, any rational trier of fact could have found the essential

26  elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979);

*Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000).   The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution.  *Jackson*, 443 U.S. at 326; *Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc).  The credibility of witnesses is beyond the scope of the federal habeas court's review of the sufficiency of the evidence. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).  This standard impinges on the jury's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law."  *Jackson*, 443 U.S. at 319.  *Jackson* presents "a high standard" to habeas petitioners.  *See Jones*, 207 F.3d at 563.

Hayward was convicted on four counts.  On Count 1, Hayward was convicted of lewdness with a minor, for placing his penis between Jane's legs and simulating sexual intercourse. *See* Exhibits C, I.  On Count 2, he was convicted of sexual assault, for forcing Jane to perform fellatio, by sucking or licking his penis.  *See id.*  On Count 3, he was convicted of lewdness with a minor, for sucking or licking Jane's anal opening.  *See id.*  On Count 4, he was convicted of lewdness with a minor, for licking Jane's vaginal area.  *See id.*

The jury was instructed as follows regarding the crime of lewdness with a minor:

> Any person who wilfully and lewdly commits any lewd or lascivious act, other than acts constituting the crime of sexual assault upon or with the body, or any part or member thereof, of a child under the age of fourteen (14) years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child is guilty of the crime of Lewdness With a Minor.

Exhibit H, Instruction No. 4.  The jury was instructed as follows with regard to the crime of sexual assault:

> Any person who subjects another person under the age of fourteen (14) to sexual penetration, against that victim's will or under conditions in which the perpetrator knows the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault.

> Sexual penetration means fellatio or any intrusion, or licking, however slight of a vagina or anus.

*Id.*, Instruction 6.

Jane testified that Hayward "put his penis in between [her] legs" and "rubbed his penis in between [her] legs," and that Hayward's penis was hard when he did so.  Exhibit F, p. 78. In addition, Sally testified that Jane told Detective Richardson that Hayward "put his penis between her legs when she was on her back, and ran it up and down." *Id.* at 123.  The evidence was sufficient for a reasonable juror to find Hayward guilty on Count 1.

With respect to the sexual assault charge in Count 2, Jane testified as follows:

Q.    After he did that, after he licked your butt, what happened?

A.    He made me lick his penis.

Q.    Well, where [is] his penis located?

A.    Between his legs.

Q.    Do you remember whether his penis was hard or soft when he made you lick it?

A.    Hard.

Q.    Did he say anything to you?

A.    No.

Q.    Did he – how did he have you lick his penis?

A.    He told me to.

Q.    What did he say to you?

A.    It would taste good.

Q.    How long did you lick his penis?

A.    I just put it down.

Q.    What do you mean, Sweetheart?

A.    I really didn't lick it.

Q.    What do you mean you really didn't lick it?

A.    I don't know.

Exhibit F, p. 77.  While Jane's testimony could be read to include some ambiguity as to whether Jane

1    in fact licked Hayward's penis, that possible ambiguity was for the jury to resolve, in light of all the

2    evidence.  Jane's testimony that Hayward "made [her] lick his penis" is, in this court's view,

3    sufficient under *Jackson* to support the conviction on Count 2.  Moreover, Sally testified that Jane

4    told her that Hayward "made her suck his penis."  *Id*. at 124.  And, Sally also testified that Jane told

5    Detective Richardson that Hayward told her that he wanted her to suck his penis, because it would

6    taste good, and that Jane did not want to, but Hayward "made her do it anyway."  *Id*. at 123.  There

7    was sufficient evidence to support Hayward's conviction on Count 2.

8                    As for the lewdness charge in Count 3, Jane testified:

9            Q.      After he licked your pee-pee with his tongue, what did he do then?

10           A.      Licked my butt.

11           Q.      What did he lick it with?

12           A.      His tongue.

13                                              *    *    *

14           Q.      [Jane], how long did Rodger lick your butt?

15           A.      I don't know.

16           Q.      Did his tongue go inside of your butt?

17           A.      No.

18   Exhibit F, pp. 75-77.  Here again, this testimony was corroborated by Sally's testimony.  Sally

19   testified that Jane told her, and also Detective Richardson in her presence, that Hayward "licked ...

20   her butt."  *Id*. at 123-24.  There was sufficient evidence at trial to support Hayward's conviction on

21   Count 3.

22                   Finally, with regard to Count 4,  Jane testified as follows:

23           Q.      After he made you take off your clothes and he took off his clothes,
             what happened?
24
             A.      He licked my pee-pee.
25
             Q.      Where is your pee-pee located?
26
             A.      Between your legs.

1        Q.      What did he lick it with?

2        A.      His tongue.

3        Q.      how long did he do that?

4        A.      I don't know.

5  Exhibit F, p. 75.  Sally testified that Jane told her, and also Detective Richardson in her presence,

6  that Hayward "licked her pee-pee."  *Id*. at 123-24.  There was sufficient evidence at trial to support

7  Hayward's conviction on Count 4.

8        Hayward argues:

> The evidence presented to support a conviction on the essential elements of the crime charged in this case was entirely hearsay and in violation of the Sixth Amendment's right to full and fair cross examination.  Hayward was not convicted through the testimony of the child witness.  Furthermore, any incriminating evidence presented through the child witness's own testimony must be disregarded because she was not competent to testify.  Hayward was convicted through the use of advocates and surrogates for the child witness.  This cannot support a constitutional finding of guilt beyond a reasonable doubt on each and every element of the offense of conviction.

14  Opening Brief, pp. 44-45.  This argument is without merit.  Jane was ruled competent to testify, and,

15  as is discussed below in conjunction with Ground 4, there is no constitutional infirmity with respect

16  to that ruling.  This court therefore takes into consideration Jane's testimony in this sufficiency-of-

17  evidence analysis.  Furthermore, as the court rules below in the context of Ground 4, the admission

18  of the testimony of Sally and Bea did not violate Hayward's constitutional right to confront

19  witnesses.  Therefore, in analyzing the sufficiency of the evidence, the court also takes into

20  consideration the testimony of Sally and Bea.  The testimony of Jane, Sally, and Bea provided

21  sufficient evidence to support Hayward's conviction on three counts of lewdness with a minor and

22  one count of sexual assault.

23        The court will deny habeas corpus relief with respect to Ground 2.

24        <u>Ground 3</u>

25        In Ground 3, Hayward claims that he was denied his rights under the Sixth and

26  Fourteenth Amendments as a result of judicial misconduct.  2004 Amended Petition, pp. 24-28.

First, Hayward claims that the trial court violated his constitutional rights by rejecting a negotiated plea agreement. *Id*. at 24-27. Second, Hayward claims that the trial court violated his constitutional rights by not allowing him to represent himself at trial. *Id*. at 27. Third, Hayward claims that the trial court violated his constitutional rights by not allowing him to be present during the settling of the jury instructions. *Id*.

Respondents take the position that Ground 3 is procedurally barred, contending that the one time the claims in Ground 3 were raised in the Nevada Supreme Court that court denied those claims on state procedural grounds. *See* Response to Opening Brief (docket #162), pp. 11-15; *see also Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991). In response, petitioner contends that respondents' procedural default defense has been waived, and is beyond the scope of the remand to this court from the court of appeals.

It is well established that procedural default is an affirmative defense, and that the State's failure to raise the issue in response to the habeas petition may constitute a waiver of the defense. *Chaker v. Crogan*, 428 F.3d 1215, 1220-21 (9th Cir. 2005); *Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003); *Franklin v. Johnson*, 290 F.3d 1223, 1233 (9th Cir. 2002). On the other hand, the court of appeals has instructed that the waiver may be overlooked where the State provides a sufficient explanation for its failure to raise the issue at the appropriate juncture. *See Chaker*, 428 F.3d at 1220-21; *Vang*, 329 F.3d at 1073; *Franklin*, 290 F.3d at 1233.

In this case, the respondents did not raise the issue of procedural default in their answer. *See* Answer (docket #134), pp. 22-27. In the answer, the respondents addressed the claims in Ground 3 on their merits. *Id*. Nor did the respondents raise the procedural default issue in the court of appeals, even when requesting the current remand. *See* Motion to Remand, Exhibit C to Request for Expedited Status Conference (docket #154). Only now, on remand from the court of appeals, in response to the motion for reconsideration, did the respondents assert the procedural default issue for the first time. Respondents proffer no explanation for their failure to assert the procedural default defense in their answer, or, for that matter, at any time prior to the entry of

1    judgment in this case.  *See* Response to Opening Brief (docket #162), pp. 11-15.  Under these

2    circumstances, respondents have waived the procedural default defense.  The court will therefore

3    reconsider Ground 3, on the merits of petitioner's claims.

4              On August 13, 1982, ten days before Hayward's trial commenced, the parties

5    appeared before the trial court, and the prosecutor presented the terms of a negotiated plea

6    agreement.  Exhibit E (transcript of hearing).  The prosecution and the defense had apparently agreed

7    that the information would be amended to include only two counts of lewdness with a minor, the

8    other charges would be dismissed, Hayward would plead guilty to the two remaining lewdness

9    counts, and the prosecution would stand silent with regard to sentencing.  *Id*. at 2.  The court,

10   however, rejected the plea agreement, stating:

11             Counsel, the youngest victim I ever had was seven, and I had the problems
         which you are asking the Court today to decide, whether or not we should go to trial
12       and determine whether or not he is innocent or guilty of these offenses and be
         punished accordingly, or whether we should save the feelings of the five-year-old
13       victim and her family.

14             I am of the opinion that some cases have to be tried, and I would not be
         willing to accept the negotiations.

15                                     *   *   *

16             I say that no [sic] only for counsels' relative positions and the victim, but I just
17       think some cases have to be tried, and this is one of them.

18   *Id*. at p. 5, lines 19-31.

19             There is no constitutional right to a plea bargain.  *Weatherford v. Bursey*, 429 U.S.

20   545, 561 (1977); *see also United States v. Savage*, 978 F.2d 1136, 1137 (9th Cir. 1992).  As the

21   Supreme Court observed in *Weatherford*, "It is a novel argument that constitutional rights are

22   infringed by trying the defendant rather than accepting his plea of guilty."  *Weatherford*, 429 U.S.

23   at 561.

24             Hayward concedes that there is no constitutional right to a plea bargain (Opening

25   Brief, p. 47), but he agues that under Nevada law, the court's rejection of the plea agreement was

26   judicial misconduct, and that judicial misconduct indicates that he was denied a fair and impartial

1    judge, in violation of the Fourteenth Amendment.  The court disagrees.  The trial court's rejection of

2    the plea agreement does not indicate any unfairness toward Hayward or partiality toward the State.

3    Indeed, the State advocated in favor of the plea agreement.  The State explained that it had reason to

4    enter the plea agreement: Jane's age and fear of testifying.  *See* Exhibit E, pp. 2-3.  The rejection of

5    the plea agreement did not show any partiality toward the State on the part of the judge.

6            Next, Hayward claims that the trial court violated his federal constitutional right to

7    due process of law when it denied his request to represent himself at trial.  2004 Amended Petition,

8    p. 27.

9            A criminal defendant has a constitutional right to represent himself.  *Faretta v.*

10   *California*, 422 U.S. 806, 820 (1975).  However, that right is not absolute; in order to invoke the

11   right of self representation, the defendant's request must be timely.  *United States v. McKenna*, 327

12   F.3d 830, 844 (9th Cir. 2003); *Avila v. Roe*, 298 F.3d 750, 753 (9th Cir. 2002).  Hayward made his

13   request for leave to represent himself on the first day of trial, after the jury was selected.  *See*

14   Exhibit F, pp. 40-41.  The trial court denied the request on the ground that it was untimely.  *Id*.

15           In *Faretta*, the Court pointed out that the defendant's request to represent himself was

16   made  "[w]ell before the date of trial," and "weeks before trial."  *Faretta*, 422 U.S. at 807, 835.  In a

17   2005 Ninth Circuit case, the court of appeals affirmed the denial of habeas corpus relief on a *Faretta*

18   claim, where the request for self-representation was made on the morning of trial.  *Marshall v.*

19   *Taylor*, 395 F.3d 1058, 1061 (9th Cir. 2005); *see also Moore v. Calderon*, 108 F.3d 261, 264 (9th

20   Cir. 1997), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000) (request for

21   self-representation timely if made before jury empaneled, unless it is shown to be a tactic to secure

22   delay); *United States v. McKenna*, 327 F.3d 830, 844 (9th Cir. 2003) (same).

23           In this case, Hayward's federal constitutional rights were not violated when his

24   request to represent himself, made on the first day of trial, after the jury was empaneled, was ruled

25   untimely and denied by the trial court.

26           Next, Hayward claims that the trial court committed unconstitutional misconduct by

1    not having him present when the jury instructions were settled.  2004 Amended Petition, p. 27.[6]

2           The Supreme Court has held that, under the Sixth and Fourteenth Amendments, a

3    criminal defendant has a constitutional right to be present at all critical stages of his trial.  *Illinois v.*

4    *Allen*, 397 U.S. 337, 338 (1970).  More specifically, "a defendant has a due process right to be

5    present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness

6    of his opportunity to defend against the charge.... [T]he presence of a defendant is a condition of due

7    process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent

8    only.'"  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291

9    U.S. 97, 105-06 (1934)).  A defendant has no right to be present "when presence would be useless,

10   or the benefit but a shadow."  *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Synder*, 291

11   U.S. 106-07).  In essence, "a defendant is guaranteed the right to be present at any stage of the

12   criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of

13   the procedure."  *Stincer*, 482 U.S. at 745.

14          The Ninth Circuit Court of Appeals has held that, in a federal criminal case, the right

15   of a defendant to be present at all critical stages of trial does not extend to a conference dealing with

16   only the legal questions involved in formulating a proper set of jury instructions.  *See United States*

17   *v. Sherman,* 821 F.2d 1337, 1339 (9th Cir. 1987); *see also United States v. Rubin,* 37 F.3d 49, 54

18   (2nd Cir. 1994); *United States v. Graves*, 669 F.2d 964, 972-73 (5th Cir. 1982); *see also*

19   Fed.R.Crim.P. 43(c)(3) (excusing the presence of the defendant, in a federal criminal trial, at "a

20   conference or argument upon a question of law").

21          Hayward has stated baldly, in the 2004 Amended Petition and the reply to the

22   respondents' answer, that he "was not allowed to attend and because of that was unable to seek and

23   

24          [6] Hayward has pointed to nothing in the record to indicate that either he or his counsel made a
     request for him to be present at the jury instruction conference, and the court has found nothing to
25   indicate there was any such request.  *See* Exhibit G, pp. 28-30.  There is authority from outside the Ninth
     Circuit to the effect that a criminal defendant might waive his right to be present if he makes no request.
26   *See Cohen v. Senkowski*, 290 F.3d 485, 491 (2nd Cir. 2002).  However, as is explained below, the court
     concludes that Hayward had no right to be present at the jury instruction conference, and does not reach
     the waiver issue.

obtain two critical jury instructions."  2004 Amended Petition, p. 27, lines 26-28; Petitioner's

Traverse (docket #139), p. 11, lines 1-2.  However, he does not address this argument at all, or

provide any explanation of it, in the briefing of the current motion for reconsideration.  Hayward

does not explain why his presence would have contributed to the fairness of the proceeding – that is,

what he could have added to his counsel's efforts at the conference.  Hayward has not shown that his

presence at the settling of the jury instructions would have contributed to the fairness of the hearing,

served any useful purpose, or had any effect whatsoever on the court's rulings.  *See Snyder*, 291 U.S.

at 106-07; *Stincer*, 482 U.S. at 745.

This court therefore concludes that Hayward's federal constitutional rights were not

violated on account of his absence from the jury instruction conference.

The court will deny habeas corpus relief with respect to Ground 3.

Ground 4

In Ground 4, Hayward claims that his right to confront witnesses and right to due

process of law, under the Sixth and Fourteenth Amendments, were violated as a result of the trial

court's handling of Jane's testimony and her out-of-court statements.  2004 Amended Petition,

pp. 28-34.  Hayward first claims that the trial court improperly determined that Jane was competent

to testify.  *Id*. at pp. 28-31.  Hayward also claims that his constitutional right to confront witnesses

was violated as a result of the admission of hearsay testimony of Jane's mother and babysitter,

recounting statements made by Jane outside of court.  *Id*. at 31-34.

With respect to Jane's competency, the only question for this federal court, in this

federal habeas action, is whether the state court determination that Jane was competent violated

constitutional norms.  *See Walters v. McCormic*, 122 F.3d 1172, 1175 (9th Cir. 1997).  In *Walters*,

the court of appeals wrote:

> Admission of the testimony of the child victim ... is an evidentiary
> issue that the Montana trial court addressed under Montana law.  We do not
> review the admission for error; "we may only consider whether [Walters's]
> conviction violated constitutional norms."

1   *Walters*, 122 F.3d at 1175 (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991)).

2          Hayward concedes that the trial court did inquire into Jane's competence (*see*

3   Exhibit F, pp. 57-69), but he contends that the inquiry was constitutionally deficient.  *See* Opening

4   Brief, pp. 51-53.

5          In *Walters*, the court of appeals stated:

6          Where state or federal law provides that a competency determination must be
           made, failure to conduct an appropriate hearing implicates a defendant's due
7          process rights ....  After a defendant raises a colorable objection to the
           competency of a witness, the trial court must perform "a reasonable
8          exploration of all the facts and circumstances" concerning competency.

9   *Walters*, 122 F.3d at 1176 (quoting *Sinclair v. Wainwright*, 814 F.2d 1516, 1523 (11th Cir.1987)).

10         Hayward does not make any showing that the competency inquiry was deficient.

11  Hayward only describes the hearing as "a brief exchange between counsel, [Jane], and the trial judge

12  in the presence of the jury," and then goes on to argue that this "can hardly be considered the type of

13  'meaningful hearing' required by the Constitution."  Opening Brief, p. 52.  The court does not

14  concur with Hayward's characterization of the competency hearing.  *See* Exhibit F, pp. 57-69.

15  During that hearing, the judge first questioned Jane about her understanding of the oath, and about

16  her obligation to tell the truth.  *Id*. at 57-58.  The prosecutor and the judge asked Jane about such

17  matters as her age, her birthday, her recent trip to see her father, her living arrangement, her mother's

18  job, and her testimony at Hayward's preliminary hearing.  *Id*. at 58-61.  Defense counsel and the

19  judge then questioned Jane about her preparation for her trial testimony.  *Id*. at 61-63.  The judge

20  again asked questions about Jane's fear of testifying, and her understanding that she had to tell the

21  truth.  *Id*. at 63.   Defense counsel then questioned Jane further about her preparation and about her

22  preliminary hearing testimony.  *Id*. at 64-65.  The judge then further questioned Jane about her age

23  and her birthday, her mother's age and birthday, and her father's age and birthday.  *Id*. at 66.

24  Defense counsel then questioned Jane further about her understanding of the difference between the

25  truth and a lie, and about her obligation to tell the truth.  *Id*. at 66-68.  Defense counsel concluded by

26  questioning Jane further about her preparation for her testimony.  *Id*. at 68-69.  After this extensive

1   questioning of then-six-year-old Jane, the court ruled as follows:

2              All right.  The Court will make the threshold determination that the
        witness is competent, cautioning the jury, however, that the Court's determination is
3       not dispositive.  It is for the jury to decide the ultimate analysis whether this witness
        is competent or credible.

4

5   *Id*. at 69.

6              This court concludes that the trial court conducted a reasonable exploration of the

7   facts and circumstances concerning Jane's competency.  Hayward's constitutional due process rights

8   were not violated by the manner in which the inquiry was conducted.

9              Next, Hayward claims that his right to due process of law and his right to confront

10  witnesses, under the Sixth and Fourteenth Amendments, were violated by the admission, through

11  Sally and Bea, of Jane's hearsay statements.  2004 Amended Petition, pp. 31-34.

12             Of course, it is not for this court to decide whether, as a matter of state evidence law,

13  the trial court was correct in admitting the testimony of Sally and Bea.  *See Estelle v. McGuire*, 502

14  U.S. 62, 67 (1991).  "It is not the province of a federal habeas court to reexamine state-court

15  determinations on state-law questions."  *Id*.  "In conducting habeas review, a federal court is limited

16  to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id*.

17  The question for this court is whether the testimony of Sally and Bea violated Hayward's federal

18  constitutional rights.

19             In this case, Jane testified at trial, and was cross examined at length by defense

20  counsel.  Exhibit F, pp. 59-110.  Because Jane testified, and because Hayward's counsel had an

21  opportunity to cross-examine her, there was no violation of Hayward's right of confrontation.

22             Here, Hayward relies primarily upon the cases of *Idaho v. Wright*, 497 U.S. 805

23  (1990), and *White v. Illinois*, 502 U.S. 346 (1992).  *See*, *e.g.*, Opening Brief, pp. 60-61.  But those

24  cases both involved out-of-court statements by a child victim who was unavailable to testify at trial.

25  Again, Jane testified and was cross examined.  Hayward has not cited any authority holding that

26  there is a viable Confrontation Clause issue where the out-of-court declarant testifies and is cross

1  examined at trial.

2       Apparently, it is Hayward's position that he was effectively denied cross examination

3  of Jane because Jane was incompetent to testify.  *See* Opening Brief, pp. 57-58.  However, as is

4  discussed above, the trial court conducted a reasonable inquiry, and determined Jane to be competent

5  to testify, and this court will not disturb that finding.

6       The Confrontation Clause guarantees only an opportunity to cross-examine; it

7  "includes no guarantee that every witness called by the prosecution will refrain from giving

8  testimony that is marred by forgetfulness, confusion, or evasion."  *Delaware v. Fensterer*, 474 U.S.

9  15, 20 (1985).  "To the contrary, the Confrontation Clause is generally satisfied when the defense is

10  given a full and fair opportunity to probe and expose these infirmities through cross-examination,

11  thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness'

12  testimony."  *Id*. at 21-22.

13       Hayward's federal constitutional rights were not violated by the admission of the

14  testimony of Sally and Bea regarding Jane's out-of-court statements.

15       The court will deny habeas corpus relief with respect to Ground 4.

16  <u>Certificate of Appealability</u>

17       Hayward requests: "If this Court denies ground one through four then Hayward

18  respectfully asks for a COA on the same five assignments of error that this Court granted in its

19  February 27, 2008 Order."  Reply (docket #163), p. 6.

20       The standard for issuance of a certificate of appealability calls for a "substantial

21  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).  The Supreme Court

22  interpreted 28 U.S.C. § 2253(c) as follows:

23       Where a district court has rejected the constitutional claims on
the merits, the showing required to satisfy §2253(c) is straightforward:

24  The petitioner must demonstrate that reasonable jurists would find the
district court's assessment of the constitutional claims debatable or wrong.

25  The issue becomes somewhat more complicated where, as here, the district
court dismisses the petition based on procedural grounds.  We hold as follows:

26  When the district court denies a habeas petition on procedural grounds
without reaching the prisoner's underlying constitutional claim, a COA should

1
2
3

> issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

4  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

5  (9th Cir. 2000).  The Supreme Court further illuminated the standard for issuance of a certificate of

6  appealability in *Miller-El v. Cockrell*, 537 U.S. 322 (2003).  In that case, the Court stated:

7
8
9

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

10  *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).

11        In light of these standards, the court finds that petitioner is entitled to a certificate of

12  appealability.

13        **IT IS THEREFORE ORDERED** that, pursuant to Federal Rule of Civil Procedure

14  60(b), the court reconsiders the order (docket #141) and judgment (docket #142) entered

15  September 27, 2006.  The order (docket #141) and judgment (docket #142) entered

16  September 27, 2006, are **VACATED**.

17        **IT IS FURTHER ORDERED** that petitioner's First Amended Petition for Writ of

18  Habeas Corpus (docket #124) is **DENIED**.

19        **IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly.

20        **IT IS FURTHER ORDERED** that petitioner is granted a certificate of appealability

21  with respect to the following issues:

22
23

> 1.    Whether Hayward is entitled to an unconditional writ of habeas corpus and immediate release from custody due to the State of Nevada's failure to comply with the Ninth Circuit's June 10, 1994 order granting Hayward a direct appeal from his conviction and sentence.

24
25

> 2.    Whether Hayward's Fifth and Fourteenth Amendment rights to due process were violated by the repeated instances of prosecutorial misconduct during closing argument.  (Ground One)

26

> 3.    Whether Hayward's convictions and sentences for the crimes of sexual

assault and lewdness with a minor were obtained in violation of his Fourteenth Amendment right to due process as defined by the United States Supreme Court in Jackson v. Virginia because the State did not present sufficient proof to justify that he was guilty beyond a reasonable doubt of each of those offenses.  (Ground Two)

      4.      Whether the trial court's misconduct throughout the course of the proceedings culminating in Hayward's guilty verdicts, conviction, and sentence resulted in a violation of his rights under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  (Ground Three)

      5.      Whether the child witness's hearsay statements presented during Hayward's trial through other witnesses resulted in a violation of his Sixth Amendment right to confrontation and Fourteenth Amendment right to due process. (Ground Four)

      Dated this 27th day of March, 2009.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE